1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

ROBERTO RANGEL,                                )    1:04-CV-05988 OWW SMS HC
                                               )
                    Petitioner,                )
                                               )    **FINDINGS AND RECOMMENDATION**
        v.                                     )    **REGARDING PETITION FOR WRIT OF**
                                               )    **HABEAS CORPUS**
                                               )
DERRAL G. ADAMS,                               )
                                               )
                    Respondent.                )
_____           )

        Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus

pursuant to 28 U.S.C. § 2254.

## BACKGROUND

        Petitioner is currently in the custody of the California Department of Corrections pursuant to

a judgment of the Superior Court of California, County of Fresno, following his conviction by jury

trial on December 14, 2001, of the first degree murder of Norberto Castillo, (Cal. Penal Code

§ 187(a)), with the special allegation that he personally used a firearm and caused great bodily injury

or death (Cal. Penal Code § 12022.53(d)); and assault with a firearm on Pedro Montoya, (Cal. Penal

Code § 245(a)(2)), with the special allegation that he personally used a firearm during the

commission of the offense (Cal. Penal Code § 12022.5(a)(1)). See Lodged Item No. 4.[1] On May 3,

---

[1]"Lodged Item" refers to the documents lodged by Respondent with his response.

1  2002, he was sentenced to serve an aggregate indeterminate term of fifty-seven years to life in state

2  prison. Id.

3       Petitioner filed a notice of appeal to the California Court of Appeals, Fifth Appellate District

4  (hereinafter "Fifth DCA"). On July 7, 2003, the Fifth DCA affirmed the judgment. Id. On July 15,

5  2003, Petitioner filed a petition for review in the California Supreme Court. See Lodged Item No. 5.

6  The petition was summarily denied on October 1, 2003. Id.

7       On October 25, 2004, Petitioner filed a petition for writ of habeas corpus in the Fresno

8  County Superior Court. See Lodged Item No. 6. The petition was denied on November 9, 2004. Id.

9  Petitioner next filed a petition for writ of habeas corpus in the Fifth DCA on December 9, 2004. See

10 Lodged Item No. 7. The Fifth DCA denied the petition on December 22, 2004. Id. On January 26,

11 2005, Petitioner filed a petition for writ of habeas corpus in the California Supreme Court. See

12 Lodged Item No. 8. The petition was denied on January 4, 2006. Id.

13      On July 20, 2004, Petitioner filed a federal petition for writ of habeas corpus in this Court.

14 Following a stay of the petition, on January 26, 2006, Petitioner filed a first amended petition. The

15 amended petition presents the following two claims for relief: 1) "The trial court committed

16 prejudicial error under Federal Constitutional Law in receiving evidence of Petitioner's admission in

17 violation of the Miranda Rule"; and 2) "There is insufficient evidence of the murder charges to

18 support Petitioner's conviction." See Amended Petition. Respondent filed an answer on June 5,

19 2006. Petitioner filed a traverse on August 17, 2006.

20                     **FACTUAL BACKGROUND**[2]

21      Sometime after midnight on June 9, 2001, Norberto Castillo was fatally shot at the El Corral

22 Bar in Fresno. Petitioner Roberto "Chino" Rangel was arrested, charged, and convicted of first

23 degree murder. He was also convicted of assault with a firearm, based on wounding an associate

24 during the shooting.

25 **The El Corral Bar**

26      On the evening of Friday, June 8, 2001, Norberto Castillo picked up his cousin, Francisco

27

28      [2]The facts are taken from the factual summary set forth by the Fifth DCA in its opinion of July 7, 2003, and are presumed correct. 28 U.S.C. §§ 2254(d)(2), (e)(1). See Lodged Item No. 4.

Avalos, and they drove to Tony Lopez's house, where they split an 18-pack of beer. Castillo only drank three or four beers because he was driving. Avalos testified that Lopez offered to sell a .380-caliber handgun to Castillo for $100. Castillo examined the weapon and thought it was in good condition. Lopez gave him a bullet and invited him to test fire the gun. Castillo went outside and loaded the bullet in the gun, racked the slide, and tried to fire, but it didn't work. Castillo tried to fire the handgun two more times but it never discharged. Avalos testified that when Castillo tried to rack the slide, the bullet stood straight up instead of going into the chamber. Nevertheless, Castillo paid for the gun and placed it in his belt, and they left Lopez's house. Castillo got into his car and placed the gun inside the center console. Avalos believed Castillo purchased the gun in order to fix it and resell it for a profit.

Around 8:00 p.m., Castillo and Avalos arrived at El Corral Bar on East Belmont Avenue in Fresno. El Corral had a serving bar, a juke box, and several pool tables. Avalos testified there were about 25 people inside the building, and they recognized some of the patrons from their prior visits. Castillo was wearing cowboy boots and a cowboy hat. Castillo and Avalos stood at the serving bar and drank several beers with two other men. The juke box was playing and the overhead bar lights were on. Avalos testified Castillo talked and laughed with Rebecca Villaverde, who worked as the bartender. There were no arguments or fights while they were there.

Castillo and Avalos left the bar around 9:15 p.m., and Castillo drove Avalos back to his apartment. Avalos testified they had consumed the same amount of beer together and he was "[m]ore or less" sober. Castillo said he was going to take his wife to dinner and left.

**The Shooting**

Even though Norberto Castillo said he was taking his wife to dinner, he actually returned to El Corral Bar. Jose "Wache" Magana was working at El Corral that night, and testified Castillo arrived some time between 10:00 p.m. and 11:00 p.m. Castillo was wearing a big cowboy hat and boots, and stood at the serving bar with Magana and Rebecca the bartender. Magana testified Castillo asked Rebecca to drink with him, but Rebecca refused. Magana described Castillo as acting like a big man and showing off. Magana believed Castillo was being a little aggressive toward Rebecca because he had been drinking.

1    Magana testified that Petitioner Roberto "Chino" Rangel arrived at El Corral later that night

2    with Pedro Montoya. Petitioner and Magana were cousins. Pedro Montoya sat at the serving bar and

3    Petitioner played dice at the pool table. Magana testified that Castillo continued to bother Rebecca

4    and flirt with her. Magana testified that Rebecca and Pedro Montoya were dating, Montoya paid the

5    rent for Rebecca's apartment, and Montoya had been jealous about her on a previous occasion.

6    Montoya now became upset about Castillo's conduct toward Rebecca. Magana decided to warn

7    Castillo and told him "in a loud voice not to bother her because Pedro was there, and he could get

8    upset." Magana never saw Castillo display a gun.

9    Magana noticed that Castillo was upset and he tried to calm him down. Magana testified that

10   Petitioner left the pool table and came to the serving bar. Petitioner pulled Magana by the shirt, said

11   he didn't have anything to do there, and told him to get away. Magana left the serving bar and went

12   to the dice table, and Petitioner walked out of the building.

13   Magana testified he went into the restroom and heard gunshots. He immediately returned to

14   the bar and saw Petitioner firing a gun in the general direction of the serving bar. At trial, Magana

15   testified he didn't see who Petitioner was shooting at. However, Magana admitted he previously told

16   the police that Petitioner was firing at Castillo, who was still standing at the serving bar. Magana

17   testified Petitioner fired more than three shots, and Castillo fell down next to the serving bar.

18   Magana quickly left the building and didn't look back to see what Petitioner or anyone else was

19   doing. Magana didn't know how many shots were fired because there was too much confusion.

20   Miguel Valladares testified he was playing dice at the pool table with Petitioner, Luis

21   Palomar and other patrons. Valladares testified that Pedro Montoya had an argument with Rebecca

22   the bartender earlier in the evening because he was jealous. Valladares testified that sometime after

23   midnight, Petitioner received a call on his cell phone and went outside because the juke box music

24   was very loud. Petitioner reentered the building within five minutes. Valladares heard gunshots

25   "immediately" after Petitioner returned to the building. "When [Petitioner] cross[ed] by the opening

26   and about five seconds or so, they start[ed] shooting." Valladares's back was to the serving bar when

27   the shots were fired. He turned around and saw Pedro Montoya walking toward the juke box and

28   firing a handgun. Valladares jumped over the pool table to protect himself and fell on top of Rebecca

the bartender, who was already hiding on the floor.

Valladares testified two shots were initially fired. There was a slight pause, and at least 10 more shots were fired. The gunshot sounds echoed in the building and everything happened very fast. Valladares stayed under the pool table and did not see Petitioner firing a gun. However, he heard gunshots being fired from the area where Petitioner had been standing by the juke box. Valladares testified Pedro Montoya walked out of the bar with one hand on his stomach and the other hand hanging by his side, and he was still holding the gun. Valladares testified everyone ran out of the bar after the shots were fired. Valladares got up and saw a body on the floor. He thought it was Jose "Wache" Magana but Luis Palomar told him it was someone else.

Rebecca Villaverde, the bartender, testified Norberto Castillo and his cousin, Francisco Avalos, arrived at El Corral around 8:00 p.m. Castillo was not a regular patron and she had never seen him before, but she had seen Avalos. Castillo stood at the serving bar, spoke to a young girl, and invited her to have a beer with him. Rebecca thought the young girl was with Castillo. Rebecca served three beers to Castillo and the girl, but denied that Castillo offered to buy her a drink. Castillo and Avalos left around 8:30 p.m., and Castillo told the girl that he would be back for her later.

Rebecca testified that Castillo returned to the bar around 12:15 a.m. Castillo was alone but it appeared as if a young man was waiting for him. Castillo and the young man sat at the far end of the serving bar, next to the men's restrooms, and they talked. Rebecca testified she could hear their conversation, and it seemed they were arguing because the young man owed money to Castillo. She served one beer to Castillo, and then she went outside to smoke a cigarette.

Rebecca testified she did not talk with Castillo, he was not rude or disrespectful toward her, he did not try to pick her up, and she did not make such claims to anyone at the bar that night. She did not see Castillo in possession of a gun or tell any of the patrons he had a gun. Rebecca admitted Pedro Montoya was also at the bar that night and they had been dating, but they just broke up a few days before the shooting. Petitioner was also at the bar.

Rebecca testified that when she returned into the building after her cigarette, she was standing by the main door when she heard gunshots. Rebecca testified she heard three or four shots, and then she ran out of the building and into the parking lot. She went to a public telephone to call

1 for a taxi because she needed a ride home. She couldn't make the call, however, so she walked to her

2 sister-in-law's house. Rebecca testified she didn't call the police that night because she was scared.

3       Luis Palomar testified he was playing dice with Petitioner and Miguel Valladares at the back

4 pool table. Petitioner went outside then returned to the bar, and Palomar thought Petitioner was

5 going to rejoin the dice game. Shortly after Petitioner returned, Palomar heard one or two shots and

6 immediately went down to the floor. He heard about six or seven more shots while he was hiding

7 under the pool table. Palomar saw more than one pair of feet moving closer to the serving bar as the

8 shots were being fired. He also saw some people struggling, but he couldn't see their faces because

9 he was still hiding under the pool table.

10      Palomar testified everyone ran out of the bar when the shooting stopped. Palomar saw Pedro

11 Montoya getting up from the floor. Montoya was near Castillo, who was lying on the floor between

12 the serving bar and one of the pool tables. Palomar tried to help Castillo but he was already dead.

13 Palomar testified he was scared and left, and he was the last person to leave the building. Palomar

14 testified he didn't call the police that night because he was on probation. The next morning, however,

15 he contacted Fernando Medina, the owner of the bar, and told him to call the police.

16 **The Investigation**

17      Around 8:30 a.m. on Saturday, June 9, 2001, Fernando Medina received a telephone call

18 from Luis Palomar that someone had been shot the previous night at El Corral. Medina owned the

19 bar's liquor license and Palomar was the manager. However, Medina testified that Palomar was

20 actually the secret owner of the establishment. Palomar couldn't hold the liquor license because of

21 his criminal record. Medina testified he had an arrangement with Palomar where he agreed to place

22 his name on the liquor license in exchange for a monthly share of the bar's income. Medina testified

23 he never went to the bar, and Palomar actually owned and operated the business.[3]

24      Palomar picked up Medina and they drove to the bar. During the drive, Palomar told Medina

25 he received a call that morning from Rebecca Villaverde, the bartender, who told him about the

26 _____

27      [3]At trial, Palomar denied the existence of this arrangement and testified he was just a patron at El Corral. However,
28 Rebecca Villaverde testified Luis Palomar was "supposedly" the owner and paid her wages, and Palomar paid Francisco
Medina to place his name on the liquor license.

shooting. When they arrived at the bar, Palomar dropped off Medina and told him to call the police. Medina stood outside the bar and saw Rebecca Villaverde walking across the street. Medina was afraid to go into the bar and went to a nearby liquor store and used their telephone to call the police.

Medina testified that he initially told the police the false story that he learned about the shooting directly from Rebecca. He didn't mention his conversation with Palomar because he wanted to keep their ownership arrangement confidential. However, Medina became nervous as he spoke to the police and he eventually revealed his arrangement with Palomar, and that Palomar told him about the shooting. Medina also told the police he saw Rebecca walking around the building when he arrived that morning.

At 8:46 a.m., Fresno Police Officer Bert Phillips and several other officers responded to the bar and spoke with Medina, who stated he learned about the shooting from Rebecca, the bartender, but he had been too afraid to go into the building. Officer Phillips testified Medina was very evasive in response to his questions, and seemed reluctant to give much information.

The officers found a black Ford Probe parked in front of the building. The officers entered the darkened building and found Norberto Castillo's body near the serving bar. The victim was lying on his back, and he was about 20 feet from the door. The victim's eyes were open but nonreactive and fixed straight ahead. The body was rigid with dried blood on the clothing. There was a black, gunmetal .380-caliber semi-automatic handgun on Castillo's left side, just a couple of inches from his hand. Castillo's hand was in a closed, clenched, holding position. There were several shell casings scattered around the floor.

Officer Phillips returned outside and again spoke with Medina, who changed his story and said he learned about the shooting from Luis Palomar. Medina also said he had just seen Rebecca Villaverde across the street while the officers were inside the building. Officer Phillips obtained her description, entered his patrol car, and drove around the block. He found and detained Rebecca, and escorted her back to the bar.

Rebecca testified she walked back to El Corral that morning because she couldn't sleep. She kept walking when she saw the police. However, the police detained her and escorted her back to the building. She walked through the building with an officer and indicated the beer bottles which she

1   sold to the patrons the previous night.

2       Officer Guy Ballesteroz conducted an extensive examination of the interior of El Corral Bar.

3   There was a spent .380-caliber brass shell casing on the pool table. There were several shell casings

4   spread across the floor, between the wall and the pool table. There were two more casings and a

5   spent slug inside a restroom. There was a bullet hole through a metal Budweiser sign affixed to the

6   wall; the projectile went through the wall, into another restroom, hit a metal grate over the restroom's

7   window, and fell on the floor next to the toilet. The bullet had been flattened when it hit the metal

8   grate. There was a bullet hole in the building's metal back door, near the juke box and restrooms.

9       There was a spent shell casing and a pack of sunflower seeds on one end of the serving bar,

10  and another spent casing on the floor on the other side of the serving bar. There were beer bottles

11  scattered on top and below the pool tables, and a pair of dice on one of the tables. There were two

12  pieces of a shoe sole on the floor, near a bar stool and the front door. There were also some intact

13  copper jacketed bullets on the floor, and some bullet fragments on the restroom floor. A $20 bill was

14  under one of the pool tables.

15      Norberto Castillo had been wearing a gold chain and medallion around his neck. He had a

16  brown wallet and $87 in his pocket. There were a couple of broken watches on the floor, just to the

17  left side of the body: a Citizen watch with a broken black leather band, and a gold Bulova watch.

18  There was a white cowboy hat, a pen, a cell phone, and a pack of gum on the floor near the body,

19  between the juke box and the pool table. Castillo had a set of keys attached to a braided leather strap

20  in his pocket; one of the keys opened the black Ford Probe parked in front of the building. Castillo's

21  fingerprints were on three beer bottles, one of which was on top of the bar.

22      Norberto Castillo had suffered five gunshot wounds to his body: three in his back, one in his

23  left hip, and one in his left arm. The pathologist testified the cause of death was the multiple gunshot

24  wounds, but it was impossible to determine the order of the wounds. All the bullet wounds followed

25  the same general direction: left to right and back to front, and the shots entered the upper part of his

26  body and traveled downward. There were no strippling marks on his body or clothes, which

27  indicated the shots were fired from a distance past 24-30 inches away.

28      The pathologist testified about the locations of the five gunshot wounds. There was an

entrance wound in his upper left back, which went into the left chest cavity and perforated the left lung, the heart, the right lung, and exited through the right anterior chest, and would have been fatal. An entrance wound in his right back went through the right lung, and also was fatal. An entrance wound in the midback went through the spinal column, the right lung and the liver, then exited the body. I could have been fatal if the victim didn't receive immediate treatment for bleeding. The entrance wound in the left hip went through the hip bone and the abdominal cavity, then exited through the right lower quadrant of the abdomen, and was not fatal. The fifth entrance wound went into the left arm, exited the arm, then went through the chest and abdominal cavities. It lacerated the liver then exited through the side, and was potentially fatal if the victim didn't receive immediate medical attention for internal bleeding. There were also two laceration abrasions on Castillo's forehead, consistent with blunt force trauma to his head. There was no evidence of broken glass in his skin to indicate the trauma was inflicted with a beer bottle. There was a single blood drop on the floor near Castillo's body.

Castillo's blood-alcohol level was .22 percent, consistent with consuming approximately nine and one-half beers in a short period of time. There was a small amount of cocaine and its metabolite in his urine, which had already passed through his bloodstream but still indicated recent use or that he was coming down from a cocaine high.

Officer Ballesteroz testified that based on the manner in which the shell casings were scattered through the building, the shots could have been fired by anybody moving from one area of the bar to another. In addition, the casings could have been kicked around the floor or stepped on as people were running out. Officer Ballesteroz testified the shell casings were consistent with a .380-caliber weapon. He also testified that if the bullets had been fired from a revolver, the casings would have remained in the revolver unless the shooter manually removed them. There was one 9-millimeter Winchester cartridge case on the floor. All the remaining casings were .380-caliber, several of which were Winchester brand.

The coroner arrived at the bar and examined the body, and removed a bullet from the victim's right front pants pocket and gave it to the police. It was a unexpended, .380-caliber full metal copper jacketed bullet with an aluminum casing. In contrast, the .380-caliber shell casings scattered on the

1   floor had brass or copper-type casings.[4]

2       The .380-caliber gun found next to Castillo's body was inoperable and not capable of firing

3   any of the .380-caliber bullets or shell casings found in the bar. Even if Castillo's gun had been

4   operable, it left different ejector marks when it was tested and could not have fired any of the bullets

5   or casings found at the scene. There were no fingerprints on the gun. Francisco Avalos later

6   identified the gun as the inoperable weapon which Castillo purchased earlier that evening.

7       The police recovered a total of six .380-caliber expended shell casings from the bar. These

8   casings all had the same ejector marks in the same location, and the same breech face marks, which

9   indicated all six casings were fired from the same gun. The six casings could not have been fired

10  from Castillo's inoperable gun or a nine-millimeter handgun. The police also recovered four bullets

11  which had been fired from the same gun, but not from the gun which fired the six .380-caliber

12  casings or Castillo's inoperable weapon. A single nine-millimeter expended casing was recovered

13  from the scene, but it was not fired from Castillo's gun and wasn't connected to any other casing or

14  bullet found in the bar. The police also recovered four bullet fragments, but they were too small to

15  determine the type of weapon they had been fired from. The murder weapon was never found.

16  **Petitioner's Postarrest Statements**

17      On June 9 and 13, 2001, Detective Robert Schiotis went to University Medical Center to

18  interview a patient admitted as "Jesus Gonzalez," who had been treated for three gunshot wounds to

19  his torso. Detective Schiotis determined the patient was actually Pedro Montoya. Montoya stated he

20  had been shot and robbed, and denied any involvement in the El Corral shooting.

21      Detective Eppie Cardenas testified Petitioner worked as a narcotics informant for him about

22  five or eight times over two and one-half years. At some point between June 9 and 17, 2001,

23  Detective Cardenas spoke with Petitioner about another matter but asked if he knew anything about

24  the incident at El Corral Bar. Petitioner said he didn't know about it and Detective Cardenas replied

25  that someone had been killed there. Petitioner replied it wasn't any of his business and he didn't

26  know anything. Cardenas testified this conversation occurred before he knew the police considered

27  _____

28      [4]The coroner replaced the bullet in the victim's pocket. The funeral home later gave this bullet to the victim's
    brother, and he gave it to the police.

Petitioner a suspect in the shooting. Petitioner was not working as an informant at that time.

On June 17, 2001, Detective Jerado Chamalbide arrested Petitioner Roberto Rangel after receiving a tip about his location. Petitioner falsely identified himself as Jose Rodriguez. Petitioner was advised of the <u>Miranda</u>[5] warnings, and the interview was tape-recorded. Petitioner denied being known as "Chino." Petitioner said he had been at the El Corral Bar on previous occasions while working with Detective Cardenas, but he didn't know about the shooting. He heard through some friends that a person was beaten at the bar but it wasn't his concern. Petitioner denied being at the bar at the time of the shooting and repeatedly claimed he was pig hunting at a ranch in Lemoore that night. Petitioner asserted he had several witnesses who would place him in Lemoore. Petitioner repeatedly said he worked as an informant for Detective Cardenas and he needed to keep in touch with him.

Petitioner asked Detective Chamalbide if he had Detective Cardenas's telephone number. Chamalbide asked Petitioner if he wanted to call him, and Petitioner said yes. The homicide investigators contacted Cardenas and told him Petitioner wanted to speak with him.

Detective Cardenas arrived at the police department and went into the interview room. No other officers were present. Petitioner immediately said he wanted to tell Cardenas the truth about what happened. Petitioner said he was at the El Corral Bar with his cousin, Jose Magana, and Norberto Castillo came at them with a gun. Petitioner said Castillo fired twice and Petitioner returned fire, and he hit Castillo once in the left rib cage. Petitioner also said there were some individuals who brought truckloads of drugs to the bar.

Detective Cardenas said he had to talk to the homicide detectives before they could continue the conversation. Cardenas left the interview room and conferred with the homicide detectives. Cardenas returned to the interview room, readvised Petitioner of the <u>Miranda</u> warnings, and asked if he would answer questions. Petitioner agreed and again told him about the incident at the bar. Petitioner said he had to get his cousin, Magana, out of the way because Castillo had a gun, he was talking to Rebecca the bartender, and he was "acting like a big man with wads of money and a gun

---

[5]<u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

on his waistband." Petitioner described Castillo's weapon as a small black gun, and said it was a .380-caliber. Petitioner said Pedro Montoya, Rebecca's boyfriend, was carrying a nine-millimeter handgun.

Petitioner admitted he had a gun but gave inconsistent statements about it. Petitioner said he left the bar and went into the parking lot, where he retrieved a .380-caliber handgun from his car. Petitioner also said a friend loaned the gun to him earlier in the evening. Petitioner then said he carried the gun in his waistband and several people knew he had it.

Petitioner said when he returned to the bar, Castillo and Pedro Montoya were next to the serving bar and physically struggling, and Petitioner heard two gunshots. Petitioner said Castillo fired his weapon, and Montoya shouted that he had been shot. Castillo turned toward Petitioner and he thought he was going to be shot next. Petitioner shot Castillo once in the left rib cage then ran out the door. Petitioner said Montoya also shot Castillo and he thought the wound was in the neck. Petitioner also gave inconsistent statements about Montoya's weapon. He said he didn't know the caliber of Montoya's gun, that Montoya carried both a .380-caliber and a nine-millimeter, and that Montoya was accompanied that night by an armed bodyguard. Petitioner said Montoya killed Castillo.

Detective Cardenas told Petitioner the victim suffered more than two gunshot wounds. Petitioner said the victim was carrying a .380-caliber handgun. Petitioner initially said he was also carrying a .380-caliber, but later said he wasn't sure of the caliber of his own weapon. Petitioner told Detective Cardenas that he drove away from the bar, threw his gun into a canal, and went home. Detective Cardenas told Petitioner it was important to retrieve the gun to compare it with the bullets in the victim's body. Petitioner said he had cleaned the gun very well. Petitioner subsequently admitted he lied about throwing the gun into the canal, and the gun was stored "in a ranch house somewhere in Lemoore." Petitioner refused to identify the ranch house and said he would contact the relevant people to retrieve the gun.

Detective Cardenas testified Petitioner was not working for him as an informant at the time of the shooting. During the interview, however, Petitioner tried to tell Cardenas about a methamphetamine laboratory. Cardenas told Petitioner they had to take care of this matter before

1  they talked about any drug information.

2  **Defense Evidence**

3        Neither Petitioner nor Montoya testified at trial. Petitioner did not call any additional

4  witnesses but recalled several prosecution witnesses. Luis Palomar admitted he had prior felony

5  convictions for driving under the influence and the sale of controlled substances in December 1999.

6  Miguel Valladares testified the bar's overhead lights were not on that night, but the small lights were

7  on over the serving bar. Valladares testified it wasn't too bright but "[y]ou can see the people there."

8  Valladares testified when he heard the first shot, he turned around and saw Petitioner walking

9  through the door, then saw Pedro Montoya firing his weapon toward the serving bar. Valladares saw

10  Montoya fire two shots and walk out of the bar, but Valladares heard several more shots fired.

11  Everyone went down to the floor when the shots were fired. Valladares had known Petitioner for a

12  long time and he wasn't a violent person.

13        Rebecca Villaverde was asked whether she feared for her safety to testify about the shooting.

14  She admitted she was afraid right after the shooting, but she felt calmer after appearing in court. She

15  denied that she went into hiding after the shooting. She quit working at El Corral after the shooting

16  "because I was afraid and I don't want any problems." Rebecca again denied that she argued with

17  Pedro Montoya shortly before the shooting.

18        Francisco Avalos again testified that he was at El Corral with Norberto Castillo early in the

19  evening, prior to the shooting. Avalos testified Castillo was not talking to a female patron, and

20  Rebecca the bartender was the only woman in the establishment. Castillo was "not exactly flirting"

21  with Rebecca but they had a short conversation. They left the bar and Castillo dropped off Avalos at

22  his apartment around 9:15 p.m. Castillo said he was going to take his wife to dinner or a dance.

23  **DISCUSSION**

24  **I.  Jurisdiction**

25        Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant

26  to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of

27  the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); <u>Williams v. Taylor</u>, 529 U.S. 362,

28  375 fn.7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S.

1    Constitution.  In addition, the conviction challenged arises out of the Fresno County Superior Court,

2    which is located within the jurisdiction of this court.  28 U.S.C. § 2254(a); 2241(d).  Accordingly,

3    the Court has jurisdiction over the action.

4           On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of

5    1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.

6    Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008 (1997); Jeffries v. Wood, 114

7    F.3d 1484, 1499 (9th Cir. 1997), *quoting* Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert.*

8    *denied,* 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320 (1997)

9    (holding AEDPA only applicable to cases filed after statute's enactment).  The instant petition was

10   filed after the enactment of the AEDPA; thus, it is governed by its provisions.

11   **II.  Legal Standard of Review**

12          This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody

13   pursuant to the judgment of a State court only on the ground that he is in custody in violation of the

14   Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

15          The instant petition is reviewed under the provisions of the Antiterrorism and Effective Death

16   Penalty Act which became effective on April 24, 1996.  Lockyer v. Andrade,  538 U.S. 63, 70

17   (2003).  Under the AEDPA, an application for habeas corpus will not be granted unless the

18   adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable

19   application of, clearly established Federal law, as determined by the Supreme Court of the United

20   States" or "resulted in a decision that was based on an unreasonable determination of the facts in

21   light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); see Lockyer,

22   538 U.S. at 70-71; see Williams, 529 U.S. at 413.

23          As a threshold matter, this Court must "first decide what constitutes 'clearly established

24   Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71,

25   *quoting* 28 U.S.C. § 2254(d)(1).  In ascertaining what is "clearly established Federal law," this Court

26   must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time

27   of the relevant state-court decision." Id., *quoting* Williams, 592 U.S. at 412. "In other words, 'clearly

28   established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by

1  the Supreme Court at the time the state court renders its decision." Id.

2        Finally, this Court must consider whether the state court's decision was "contrary to, or

3  involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at 72,

4  *quoting* 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant the

5  writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a

6  question of law or if the state court decides a case differently than [the] Court has on a set of

7  materially indistinguishable facts." Williams, 529 U.S. at 413; see also Lockyer, 538 U.S. at 72.

8  "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state

9  court identifies the correct governing legal principle from [the] Court's decisions but unreasonably

10 applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

11       "[A] federal court may not issue the writ simply because the court concludes in its

12 independent judgment that the relevant state court decision applied clearly established federal law

13 erroneously or incorrectly.  Rather, that application must also be unreasonable." Id. at 411.  A

14 federal habeas court making the "unreasonable application" inquiry should ask whether the state

15 court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

16        Petitioner has the burden of establishing that the decision of the state court is contrary to or

17 involved an unreasonable application of United States Supreme Court precedent. Baylor v. Estelle,

18 94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the states,

19 Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court

20 decision is objectively unreasonable.  See Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th

21 Cir.1999).

22       AEDPA requires that we give considerable deference to state court decisions. The state

23 court's factual findings are presumed correct, 28 U.S.C. § 2254(e)(1), and we are bound by a state's

24 interpretation of its own laws. Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir.2002), *cert. denied*, 537

25 U.S. 859 (2002), *rehearing denied*, 537 U.S. 1149 (2003).

26 **III.  Review of Petitioner's Claims**

27       **A. Ground One**

28       Petitioner alleges the trial court committed prejudicial error under Federal constitutional law

1    in receiving evidence of Petitioner's admissions in violation of the <u>Miranda</u> rule.

2        *1. Factual Background*[6]

3        On June 17, 2001, Petitioner was arrested and transported to the Fresno Police Department.

4    At approximately 12:25 a.m., he was interviewed by Fresno Police Detectives Jerardo Chamalbide

5    and Robert Schiotis. Petitioner was advised of his <u>Miranda</u> warnings and informed that the officers

6    were investigating the shooting at the El Corral Bar. Petitioner agreed to answer questions, but stated

7    he did not know anything about the shooting.

8        The detectives removed Petitioner's handcuffs, and before they asked him any questions,

9    Petitioner stated: "I work with an officer also, I work with the DEA." "Right now . . . I'm going to

10   get them thirty boxes of pills and five pounds of crank." "With Officer Santellano and Epifanio

11   Cardenas. Yeah I work with them . . . that's why I don't know anything or want to." Detective

12   Epifanio "Eppie" Cardenas testified that Petitioner had worked for him as a narcotics informant in

13   the past, but he was not working for him at the time of the shooting.

14       The detectives then asked if Petitioner had ever been to the El Corral Bar. Petitioner said he

15   had been there on occasion with Detective Cardenas "to look at people that he was going to make a

16   contract with . . . ." They asked Petitioner about his whereabouts on the night of the murder and

17   Petitioner stated he had been pig hunting in Lemoore. Petitioner again stated he had been working

18   with Cardenas during the past week on a narcotics job, and "[y]ou can ask him." Petitioner then gave

19   the detectives a detailed description of his alibi.

20       As the interrogation continued, Petitioner repeatedly mentioned his work with Cardenas.

21   When asked where he lived, Petitioner responded that Cardenas had been to his house and knew the

22   address. The detectives again asked about the bar shooting, but Petitioner stated he didn't know

23   about it until Cardenas told him: "Epifanio was the one who told me." He stated he never went to El

24   Corral because "they knew that I do work with" Cardenas. He stated he went to El Corral a few times

25   to look at people but had never done a job there. He admitted knowing some of the patrons and the

26   female bartender.

27

28       [6]These facts are derived from the opinion of the Fifth DCA. <u>See</u> Lodged Item No. 4.

The detectives reminded Petitioner he was in custody for the shooting at El Corral, and again Petitioner denied knowing anything about it. The detectives told Petitioner he was lying and they had several witnesses to prove it. Petitioner told them the witnesses were lying because he wasn't there. When the detectives pressed Petitioner that the witnesses placed him at the bar during the shooting, Petitioner said "things will be fixed by Epifanio." Detective Chamalbide told Petitioner that the situation was not something he could get out of by doing a job "with Epifanio," and asked "[w]hat is Epifanio going to say . . . what type of person are you."  The following discussion then took place:

[Chamalbide]: You want to talk to Epi . . . you work better with him.

[Petitioner]: No . . . he never answers . . . the dude . . . [inaudible] . . .

[Chamalbide]: If I . . . I can call him at home . . .

[Petitioner]: Yeah . . . if he wants to come see me because I need to give the details . . . [inaudible] . . .

[Chamalbide] No . . . If I call him . . . we are going to talk about what happened at the El Corral . . . .

Petitioner again told the detective he was working on a job with Cardenas involving 300 boxes of pills. Chamalbide told Petitioner that he was a good person who worked with officers, and they couldn't fix anything, but they could talk to the judge "that there was another reasons [sic] on why things happened." Petitioner again told him he was at the ranch, not the bar.

The detective then questioned Petitioner on whether he had been hiding, but Petitioner denied this and said if he wanted to hide he would have gone somewhere and not come back. Chamalbide told him that people were saying Petitioner was looking for money to go back to Mexico.

[Petitioner]: Yeah . . . I work . . . If I do a job like the one that I am going to do for Epifanio [inaudible] . . . If I go with the DEA they pay more . . . no I do a job and I get money and I leave. . . but . . . no . . . why am I going to go.

[Chamalbide]: Because you shot someone.

[Petitioner]: No . . . no [inaudible] . . . If I only do one job with Epifanio they pay me . . . ."

Chamalbide told Petitioner he was lying and the detectives were going to find his fingerprints at the bar. He told Petitioner he knew he was hiding and wanted to return to Mexico. Petitioner replied, "[A]ll the days I was calling Epifanio." As the interrogation came to an end, the following colloquy took place:

[Chamalbide]: What . . . what happened. Tell me what happened.

[Petitioner] I don't know . . . *lock me up. Then tomorrow . . . uh . . . I'll go with a lawyer and we'll talk about everything.*

[Chamalbide]: [inaudible].

[Petitioner]: [inaudible] . . . talking . . . *we'll talk with a lawyer. And . . . [inaudible] . . . uh . . . we will talk about everything . . .* [inaudible] . . .

[Chamalbide]: Okay . . . Okay . . . I am going to take the handcuffs off the chair . . . [inaudible] . . .

[coughing]

[key sounds]

[handcuff sounds]

[Petitioner]: [inaudible] . . .

[Chamalbide]: Okay . . . [inaudible] . . .

[Petitioner]: *Yes . . . uh . . . um . . . do you know Eppie's number?*

[Chamalbide]: Yes.

[Petitioner]: Yes.

[door opening]

[Petitioner]: Yes? Mm.

[Chamalbide]: Do you want me to call him or what?

[Petitioner]: Uh huh . . .

[Chamalbide]: And what do you want me to tell him?

[Petitioner]: *To come . . . uh . . . to see me, because I want to . . . talk . . . uh . . . uh . . . tell him this is all gonna work. I have it all ready just want to know for myself.*

[Chamalbide]: Okay.

[door closes]

(Italics added.)

Thereafter, Chamalbide called Cardenas and asked him to come to the police department. Cardenas arrived at approximately 4:05 a.m. and entered the interview room. Cardenas was the only detective present at that time.

[Cardenas]: Hey . . . what's going on? They told me you had asked for me . . . that you

1   wanted to talk to me. Well . . . I'm here . . . . They woke me up . . . . I just woke up.

2   [Petitioner]: Huh? I'm going to tell you what happened and it's the real truth. If you can help me. [inaudible] Then, the . . . the guy had a gun on his hand. And my cousin was there. Then

3   the guy arrived with the gun on the outside. . . [inaudible] . . . and he started saying things . . . [inaudible] . . . that works there. My cousin was there and he told him something to my

4   cousin. . . [inaudible] . . . then I saw and walked to get my cousin out of there. But the guy pulled out the gun, he had it in his hand [inaudible] and the other guy went at him, also with a

5   gun in hand. I turned . . . I was leaving and thought he was going to shoot me in the back. I also had a little gun (pistolita) with me, but the other guy is the one who shot him. I only shot

6   him once. The one who got him shot him in the neck. [inaudible] and he hit the other guy . . .

7   [Cardenas]: [sighs]

8   [Petitioner]: [inaudible]

9   [Cardenas]: Oh yeah . . . .

10  [Petitioner]: Yes . . . [inaudible] well yeah. Right now [inaudible]. That's why I was saying [inaudible]. And I had [inaudible] get away [inaudible]. They were arguing [inaudible].

11  That's what I know.

12  Cardenas then told Petitioner he was being held for the shooting.

13  [Petitioner]: [inaudible]. But I didn't have a change but [inaudible]. And he had a gun. I don't know who took the gun from him or what. But he arrived with the gun on the outside. When I

14  was arriving, but left . . . [inaudible] . . . .

15  [Cardenas]: Listen. I just go here. I just woke up. They called me . . . and . . . and . . . you come out with these guys here . . . let's see what's happening. Uh . . . why they have you here

16  and then I'll be back to talk with you.

17  [Petitioner]: And why if I didn't want to say anything to them, until I talked to you.

18  Cardenas then stepped out of the interview room. About 12 minutes later, he returned. He told

19  Petitioner he spoke to the other detectives and Petitioner was under arrest for the shooting death at

20  the bar. The detectives also told Cardenas that he was to advise Petitioner of his rights if he wanted

21  to ask any questions. Cardenas then readvised Petitioner and asked if he would answer questions.

22  Petitioner said yes. Cardenas then conducted a lengthy interview wherein Petitioner admitted

23  shooting Castillo but claimed he was trying to protect his cousin and Pedro Montoya.

24      *2. State Court Review of Claim*

25      This claim was presented on direct appeal to the Fifth DCA.  On July 7, 2003, the Fifth DCA

26  denied the claim in a reasoned opinion.  See Lodged Item No. 4. On July 15, 2003, Petitioner filed a

27  petition for review in the California Supreme Court.  See Lodged Item No. 5. The petition was

28  summarily denied on October 1, 2003. Id. The California Supreme Court, by its "silent order"

1  denying review of the Fifth DCA's decision, is presumed to have denied the claims presented for the

2  same reasons stated in the opinion of the Fifth DCA.  Ylst v. Nunnemaker, 501 U.S. 797, 803

3  (1991).

4       In rejecting Petitioner's claim, the Fifth DCA correctly identified and applied governing

5  Supreme Court precedent as set forth in Miranda v. Arizona, 384 U.S. 436 (1966), Edwards v.

6  Arizona, 451 U.S. 477 (1981), Oregon v. Elstad, 470 U.S. 298 (1985), Michigan v. Harvey, 494 U.S.

7  344 (1990), and Davis v. United States, 512 U.S. 452 (1994), and Rhode Island v. Innis, 446 U.S.

8  291 (1980). In applying the federal standards, the appellate court found erroneous the trial court's

9  finding that Petitioner's request for counsel was equivocal and ambiguous. Specifically, Petitioner's

10  statement, "Lock me up. Then tomorrow . . . uh . . . I'll go with a lawyer and we'll talk about

11  everything," was a close question whether it constituted an unequivocal and unambiguous invocation

12  of his right to counsel. However, the court concluded Petitioner's remarks were declarative

13  statements to hold him in custody until he spoke with an attorney the following day. The court noted

14  that Detective Chamalbide appeared to interpret the statement as an invocation of the right to

15  counsel, because he ceased the interrogation and unlocked Petitioner's handcuffs to escort him out of

16  the interview room. The court determined that Petitioner's statements constituted an unequivocal and

17  unambiguous invocation of his right to counsel, and the trial court erred in determining otherwise.

18       Nevertheless, the appellate court found the trial court properly admitted Petitioner's

19  statements. Citing Edwards v. Arizona, 451 U.S. at 484-485, inter alia, the court noted that

20  Petitioner personally "initiate[d] further communication, exchanges, or conversations" with the

21  detectives. The appellate court then  determined the detectives were justified in reinterrogation

22  because Petitioner knowingly and intelligently waived his right to have counsel present. The court

23  noted the detectives did not interrogate Petitioner further after he invoked his right to counsel.

24  Rather, Petitioner reinitiated the conversation with the detectives, asked for Cardenas, and then

25  spontaneously volunteered his statements to Cardenas without prodding. After Cardenas readvised

26  him of his Miranda rights, Petitioner agreed to answer further questions. Thus, the appellate court

27  determined Petitioner's right to counsel was not violated and the trial court properly admitted

28  Petitioner's statements into evidence.

1    *3. Applicable Standard of Review*

2        Under <u>Miranda</u>, a person in custody must be informed before interrogation that he has a right

3    to remain silent and to have a lawyer present.  <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).  "[I]f a

4    suspect requests counsel at any time during the interview, he is not subject to further questioning

5    until a lawyer has been made available or the suspect himself reinitiates conversation."  <u>Alvarez v.</u>

6    <u>Gomez</u>, 185 F.3d 995, 997 (9th Cir. 1999) (citations omitted).  Whether a suspect has invoked his

7    right to counsel is an objective inquiry.  <u>Davis v. United States</u>, 512 U.S. 452, 458-459, 114 S.Ct.

8    2350 (1994).  "Invocation of the <u>Miranda</u> right to counsel 'requires, at a minimum, some statement

9    that can reasonably be construed to be an expression of a desire for the assistance of an attorney.'"

10   <u>Id.</u>, 512 U.S. at 459, *citing,* <u>McNeil v. Wisconsin</u>, 501 U.S. 171, 178 (1991).  "But if a suspect

11   makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of

12   the circumstances would have understood only that the suspect might be invoking the right to

13   counsel, our precedents do not require the cessation of questioning."  <u>Id.</u>  Rather, the suspect must

14   unambiguously request counsel.  <u>Id.</u>

15       When a suspect unambiguously invokes his right to counsel, all further interrogation must

16   cease until counsel has been made available, "*unless the accused himself initiates further*

17   *communication, exchanges, or conversations with the police.*" <u>Edwards</u>, 451 U.S. at 484-485. "But

18   even if a conversation taking place after the accused has 'expressed his desire to deal with the police

19   only through counsel,' is initiated by the accused, where reinterrogation follows, the burden remains

20   upon the prosecution to show that subsequent events indicated a waiver of the Fifth Amendment

21   right to have counsel present during the interrogation." <u>Oregon v. Bradshaw</u>, 462 U.S. 1039, 1044

22   (1983). The question is then "whether the purported waiver was *knowing and intelligent and found*

23   *to be so under the totality of the circumstances,* including the necessary fact that the accused, not the

24   police, reopened the dialogue with the authorities." <u>Edwards</u>, 451 U.S. at 486, n. 9. "[T]his

25   determination depends 'upon the particular facts and circumstances surrounding the case, including

26   the background, experience, and conduct of the accused.'" <u>Bradshaw</u>, 462 U.S. at 1046, *citing,* <u>North</u>

27   <u>Carolina v. Butler</u>, 441 U.S. 369, 374-375 (1979), *quoting,* <u>Johnson v. Zerbst</u>, 304 U.S. 458, 464

28   (1938).

1    *4. Review of Claim*

2        In this case, the appellate court reasonably determined that Petitioner made an unambiguous

3    and unequivocal invocation of his right to have counsel present when he stated: "Lock me up. Then

4    tomorrow . . . uh . . . I'll go with a lawyer and we'll talk about everything." <u>See</u> Lodged Item No. 4.

5    The statement was not in the form of a question, and Petitioner was not attempting to clarify his right

6    to an attorney. Rather, the statement was declarative and informed the detectives that Petitioner

7    wished to be held in custody until he could speak to an attorney. As reasonably found by the court,

8    his statement to "lock me up" strongly implied he was invoking his right to silence.

9        However, as also reasonably determined by the appellate court, Petitioner thereafter

10   reinitiated the conversation. When Detective Chamalbide ceased his interrogation, unfastened

11   Petitioner's handcuffs from the chair and prepared to return him to custody, Petitioner spontaneously

12   asked: "Yes . . . uh . . . um . . .  do you know Eppie's number?" <u>See</u> Lodged Item No. 4. Chamalbide

13   said, "Yes." Petitioner responded, "Yes? Mm," to which Chamalbide replied, "Do you want me to

14   call him or what?" Petitioner then stated, "Uh huh . . ." When Chamalbide asked, "And what do you

15   want me to tell him?" Petitioner stated, "To come . . . uh . . . to see me, because I want to . . . talk . . .

16   uh . . . uh. . . tell him this is all gonna work. I have it all ready just want to know for myself." <u>See</u>

17   Lodged Item No. 4. From this exchange, it is clear Chamalbide did not interrogate Petitioner in

18   violation of his right to counsel. He did not ask questions designed to elicit incriminating remarks

19   from Petitioner; he merely responded to Petitioner's inquiry on speaking with Cardenas. Moreover,

20   taken in the context of the entire interrogation where Petitioner continuously requested to speak to

21   Cardenas, the state court reasonably concluded that Petitioner had finally accepted Chamalbide's

22   earlier offer to contact Cardenas. From the entirety of the record, it is clear Petitioner initiated the

23   contact with Cardenas, not the detectives. Petitioner continuously reminded the detectives that he

24   was working with Cardenas, that Cardenas would confirm this, that he had information for Cardenas,

25   and that he wanted to speak to Cardenas. The detectives merely called Cardenas as Petitioner had

26   asked.

27       When Cardenas reported to the police station, he made contact with Petitioner alone. He did

28   not ask any questions, he simply stated: "Well . . . I'm here." Petitioner did not respond in surprise or

1  wait for any questions, he spontaneously and eagerly gave his account of the bar shooting. Cardenas

2  responded by sighing and telling Petitioner he was being held for the bar shooting. He then informed

3  Petitioner that he needed to speak to the detectives about the case. When he returned, he readvised

4  Petitioner of his <u>Miranda</u> warnings. Petitioner then waived his rights and provided the inculpatory

5  statements used at trial.

6       Therefore, the state court properly determined that Petitioner invoked his right to counsel,

7  then spontaneously reinitiated the conversation, and then voluntarily provided inculpatory statements

8  without being questioned. The state court reasonably concluded Petitioner's constitutional rights

9  were not violated. The state court properly applied applicable Federal law in resolving the claim, and

10  the state court's rejection was not an unreasonable application of Federal law, or an unreasonable

11  determination of the facts. The claim should be denied.

12  **B. Ground Two**

13       Petitioner next alleges there was insufficient evidence to support Petitioner's conviction of

14  first degree murder.

15       *1. Applicable Standard of Review*

16       In reviewing sufficiency of evidence claims, California courts expressly follow the <u>Jackson</u>

17  standard enunciated in <u>Jackson v. Virginia</u>, 443 U.S. 307 (1979).  <u>See</u> <u>People v. Johnson</u>, 26 Cal.3d

18  557, 575-578 (1980); <u>see also</u> <u>People v. Thomas</u>, 2 Cal.4th 489, 513 (1992).  Pursuant to the

19  Supreme Court's holding in <u>Jackson</u>, the test in determining whether a factual finding is fairly

20  supported by the record is as follows:

21      [W]hether, after viewing the evidence in the light most favorable to the
    prosecution, any rational trier of fact could have found the essential elements
22      of the crime beyond a reasonable doubt.

23  <u>Jackson</u>, 443 U.S. at 319; <u>see also</u> <u>Lewis v. Jeffers</u>, 497 U.S. 764, 781 (1990).

24       Sufficiency claims are judged by the elements defined by state law.  <u>Jackson</u>, 443 U.S. at 324

25  n. 16. This Court must presume the correctness of the state court's factual findings. 28 U.S.C.

26  § 2254(e)(1); <u>Kuhlmann v. Wilson</u>, 477 U.S. 436, 459 (1986).  This presumption of correctness

27  applies to state appellate determinations of fact as well as those of the state trial courts.  <u>Tinsley v.</u>

28  <u>Borg</u>, 895 F.2d 520, 525 (9th Cir.1990).  Although the presumption of correctness does not apply to

1  state court determinations of legal questions or mixed questions of law and fact, the facts as found by

2  the state court underlying those determinations are entitled to the presumption.  Sumner v. Mata, 455

3  U.S. 539, 597 (1981).

4      *2.  Review by State Courts*

5      Like his first ground for relief, this claim was first raised on direct appeal to the Fifth DCA,

6  which rejected it in a reasoned opinion.  See Lodged Item No. 4. He then raised it to the California

7  Supreme Court by petition for review, but again was denied relief. See Lodged Item No. 5. By its

8  "silent order" denying review of the Fifth DCA's decision, the California Supreme Court is

9  presumed to have denied the claim presented for the same reasons opined by the Fifth DCA.  Ylst,

10  501 U.S. at 803.

11      In rejecting this claim, the appellate court stated:

12         Petitioner was convicted of the first degree murder of Norberto Castillo. Petitioner's
13  motion for new trial asserted there was insufficient evidence of premeditation and
deliberation to support this conviction. The trial court denied the motion and found sufficient
evidence to support the jury's verdict of first degree murder.

14
15         There was evidence of a struggle between the decedent and Pedro Montoya arising as
the result of the decedent's interest in the bartender, Montoya's present or former
girlfriend and a decision by defendant to intervene on behalf of Montoya. Defendant
16  left the bar and returned with his weapon and fired several shots at the decedent,
leaving the scene thereafter. Although this evidence was disputed, it was apparently
17  believed by the jury and was sufficient to support the jury's finding of premeditation.

18  Petitioner now contends there is insufficient evidence of premeditation and deliberation to
support his conviction for first degree murder of Norberto Castillo. Petitioner argues there is
19  no evidence he planned the murder, the purported manner of the killing did not show
premeditation, and he had no motive to kill because Castillo was flirting with someone who
20  was not his girlfriend.

21         "When considering the claim of a criminal defendant that a verdict was not supported
by sufficient evidence, 'the court must review the whole record in the light most favorable to
22  the judgment below to determine whether it discloses substantial evidence - that is, evidence
which is reasonable, credible, and of solid value - such that a reasonable trier of fact could
23  find the defendant guilty beyond a reasonable doubt. [Citations.] The standard of review is
the same when the People rely mainly on circumstantial evidence. [Citations.] Reversal on
24  this ground is unwarranted unless it appears that upon no hypothesis whatever is there
sufficient substantial evidence to support the conviction. [Citation.]

25
26         As observed in numerous cases, we apply the test of *People v. Anderson* (1968) 70
Cal.2d 15, in deciding whether the evidence is sufficient to support a finding of
premeditation and deliberation based on three factors: (1) planning activity; (2) motive
27  (established by a prior relationship and/or conduct with the victim); and (3) manner of
killing. (*Id.* at pp. 26-27; *People v. Wharton* (1991) 53 Cal.3d 522, 546-547.) "[T]his court
28  sustains verdicts of first degree murder typically when there is evidence of all three types and

otherwise requires at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3)." (*People v. Anderson, supra,* at p. 27.)

There are thus three types of evidence used to sustain a finding of premeditation and deliberation: "'(1) facts about how and what [the] defendant did prior to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing-what may be characterized as "planning" activity; (2) facts about the defendant's prior relationship and/or conduct with the victim from which the jury could reasonably infer a "motive" to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of "a pre-existing reflection" and "careful thought and weighing of considerations" rather than "mere unconsidered or rash impulse hastily executed" [citation]; (3) facts about the nature of the killing from which the jury could infer that the manner of killing was so particular and exacting that the defendant must have intentionally killed according to a "preconceived design" to take his victim's life in a particular way for a "reason" which the jury can reasonably infer from facts of type (1) or (2).'" (*People v. Hawkins, supra,* 10 Cal.4th at p. 956, quoting *People v. Anderson, supra,* 70 Cal.2d at pp. 26-27.)

"... However, as later explained in *People v. Pride* (1992) 3 Cal.4th 195, 247: '*Anderson* does not require that these factors be present in some special combination or that they be accorded a particular weight, nor is the list exhaustive. *Anderson* was simply intended to guide an appellate court's assessment whether the evidence supports an inference that the killing occurred as the result of preexisting reflection rather than unconsidered or rash impulse. [Citation.]' Thus, while premeditation and deliberation must result from "'careful thought and weighing of considerations'" [citation], we continue to apply the principle that '[t]he process of premeditation and deliberation does not require any extended period of time. "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly ...." [Citations.] '" (*People v. Bolin* (1998) 18 Cal.4th 297, 331-332.) As we have stated, these guidelines "were formulated as a synthesis of prior case law, and are not a definitive statement of the prerequisites for proving premeditation and deliberation in every case." (*People v. Hawkins, supra,* 10 Cal.4th at p. 957.)

There is substantial evidence to support Petitioner's conviction for first degree murder. As for motive, Petitioner entered the bar with Pedro Montoya and was obviously aware that someone was trying to pick up Montoya's girlfriend, Rebecca the bartender. Magana testified Montoya had previously been jealous of Rebecca, and Montoya watched as Norberto Castillo flirted with her at the serving bar. As for planning activities, Petitioner told Magana, his cousin, to get away from the serving bar, where Castillo was flirting with Rebecca. Petitioner admitted he left the building, went to his car, and armed himself with a .380-caliber handgun. Petitioner's actions also indicate his awareness of the growing tension between Montoya and Castillo. As for the manner of killing, Magana saw Petitioner firing a gun at Castillo, who was still standing at the serving bar. Magana testified Petitioner was firing "constantly" toward the serving bar, and fired three or more rounds. Miguel Valladares jumped for cover when the shots were fired, but testified he heard gunshots fired from the area where Petitioner had been standing. Luis Palomar also jumped for cover but saw more than one pair of feet moving closer to the serving bar as the shots were fired. Castillo was shot four times in the back, and once in the left side, with the bullets traveling at a downward angle, which suggests that Petitioner continued to fire as Castillo went down.

While the entire sequence occurred in a limited period of time, the process of premeditation and deliberation does not require any extended period of time. Petitioner had enough time to realize there was going to be a confrontation between Pedro Montoya and Castillo, he warned his cousin to get away from the serving bar, he went to his car to arm himself, and he returned with his gun blazing. He fired multiple shots into Castillo's back,

1    and the path of the bullets implies that he continued to fire as Castillo fell to the floor. There
2    is thus substantial evidence of premeditation and deliberation to support Petitioner's
     conviction for first degree murder.

3    See Lodged Item No. 4.

4        *3. Review of Claim*

5        First, there was substantial evidence from which a rational finder of fact could determine that

6    Petitioner shot Castillo. Petitioner's cousin, Jose Magana Rodriguez ("Magana"), testified he saw

7    Petitioner fire his gun "constantly" toward the serving bar at least three times. (RT[7] 749, 751, 765-

8    768, 772.) Although at trial he could not say at who Petitioner was shooting, he had previously told

9    Detective Schiotis that he saw Petitioner shoot at Castillo. (RT 774.) The next thing Magana saw

10   was the decedent lying on the ground next to the serving bar. (RT 769.) Detective Cardenas testified

11   that Petitioner told him he had shot Castillo in the left rib cage. (RT 1869, 1887.) Luis Palomar Cruz

12   ("Palomar") testified he saw Petitioner walk out of the bar, then walk back in.  (RT 1216-1217.)

13   Shortly thereafter, Palomar heard numerous shots. (RT 1218-1219.) Likewise, Miguel Valladares

14   ("Valladares") saw Petitioner walk out of the bar. (RT 1005.) Valladares testified that a short time

15   later he saw Pedro Montoya ("Montoya") fire his gun. (RT 1011.) He watched then as Petitioner

16   walked to another area. (RT 1011.) Although Valladares did not see Petitioner at that point because

17   he had disappeared behind a wall, he heard multiple gunshots come from that area. (RT 1011.)

18       There was also substantial evidence of premeditation and deliberation. Cardenas testified that

19   Petitioner watched Castillo enter the bar "acting like a big man with wads of money and a gun on his

20   waistband." (RT 1874.) Magana warned Castillo not to bother the bartender Rebecca because

21   Montoya was there and he could get upset. (RT 755.) Petitioner was obviously aware of the

22   mounting tension between Montoya and Castillo over Rebecca as evidenced by his warning to his

23   cousin Magana to get away from the bar area. (RT 759.) Petitioner admitted as much in his statement

24   to Detective Cardenas. Petitioner next went to his car, retrieved his gun, armed himself, and

25   returned. (RT 1875.) When he reentered the bar he fired multiple shots at Castillo. (RT 765-768,

26   772.) Castillo was hit four times in the back and once in the left side. (RT 1069.)

27

28
         [7]"RT" refers to the Reporter's Transcript on Appeal.

1    In light of the above, the appellate court reasonably concluded the evidence was sufficient

2  such that a rational trier of fact could have found Petitioner shot and killed the victim with

3  premeditation and deliberation beyond a reasonable doubt. Thus, the state court's rejection of this

4  claim was neither contrary to or an unreasonable application of clearly established Federal law, nor

5  an unreasonable determination of the facts in light of the evidence presented. See 28 U.S.C.

6  § 2254(d). The claim should be denied.

7                                    **RECOMMENDATION**

8    Accordingly, the Court RECOMMENDS that the petition for writ of habeas corpus be

9  DENIED WITH PREJUDICE and the Clerk of Court be DIRECTED to enter judgment for

10  Respondent.

11    This Findings and Recommendation is submitted to the Honorable Oliver W. Wanger, United

12  States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule 72-304

13  of the Local Rules of Practice for the United States District Court, Eastern District of California.

14  Within thirty (30) days (plus three days if served by mail) after being served with a copy, any party

15  may file written objections with the court and serve a copy on all parties.  Such a document should

16  be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the

17  objections shall be served and filed within ten (10) court days (plus three days if served by mail)

18  after service of the objections.  The Court will then review the Magistrate Judge's ruling pursuant to

19  28 U.S.C. § 636(b)(1)(C).  The parties are advised that failure to file objections within the specified

20  time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th

21  Cir. 1991).

22  IT IS SO ORDERED.

23  **Dated:**   **February 28, 2008**                    **/s/ Sandra M. Snyder**
                                                UNITED STATES MAGISTRATE JUDGE

24

25

26

27

28